[Cite as *Marietta v. Washington Cty. Woman's Home Bd. of Trustees*, 2020-Ohio-5144.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
WASHINGTON COUNTY

THE CITY OF MARIETTA,              :

    Plaintiff-Appellee,              :       Case No.    19CA23

    vs.                                      :

BOARD OF TRUSTEES FOR              :    DECISION & JUDGMENT ENTRY
WASHINGTON COUNTY WOMAN'S
HOME, et al.,                            :

    Defendants-Appellants.          :

---

APPEARANCES:

Stephen W. Funk and Emily Anglewicz, Akron, Ohio, for appellants.

Paul G. Bertram, III, Marietta City Law Director, Marietta, Ohio, for appellee.

---

CIVIL CASE FROM COMMON PLEAS COURT
DATE JOURNALIZED:   10-26-20
ABELE, J.

{¶ 1} This is an appeal from a Washington County Common Pleas Court summary judgment entered in favor of the City of Marietta, plaintiff below and appellee herein. The Board of Trustees for the Washington County Woman's Home, Mary Antons, Oriana House, Inc., and James J. Lawrence, defendants below and appellants herein, assign the following errors for review:

    FIRST ASSIGNMENT OF ERROR:

    "THE TRIAL COURT ERRED IN GRANTING THE CITY OF
    MARIETTA'S MOTION FOR SUMMARY JUDGMENT."

SECOND ASSIGNMENT OF ERROR:

"THE TRIAL COURT ERRED BY FAILING TO GRANT SUMMARY JUDGMENT IN DEFENDANTS' FAVOR."

THIRD ASSIGNMENT OF ERROR:

"THE TRIAL COURT ERRED IN GRANTING A PERMANENT INJUNCTION."

{¶ 2} For nearly one hundred twenty-three years, the Washington County Woman's Home operated a nonprofit home for elderly women at 812 Third Street in Marietta, Ohio. During the Woman's Home's existence, the City of Marietta enacted zoning ordinances that placed the property in a zoning district designated as a single-family detached residential district (an R-2 district). After the city enacted its zoning ordinances, the Woman's Home continued operating as a lawful nonconforming use.

{¶ 3} In 2018, the Woman's Home placed the property for sale. Oriana House, Inc., a nonprofit organization, entered into a contract to purchase the property. Oriana House took possession of the property with the intent to operate a residential treatment facility.

{¶ 4} Oriana House representatives contacted the city to ask about zoning permits and later submitted and obtained a "Zoning Use Certification" from the Marietta City Engineer. Shortly thereafter, the Southeast Ohio Building Department issued Oriana House a certificate of occupancy.

{¶ 5} City representatives had some back-and-forth discussions with appellants regarding Oriana House's proposed use of the property and the city's zoning ordinances. The city ultimately took the position that Oriana House must seek and obtain a special use permit from the Planning

Commission in order to operate a residential treatment facility on the property.

{¶ 6} Oriana House, however, did not agree. Oriana House believed that the city's zoning ordinances did not require it to obtain anything other than a use and occupancy permit.

{¶ 7} On April 17, 2019, the city filed a complaint against appellants and requested the court to enjoin appellants from operating a residential treatment facility without first obtaining a special use permit. Appellee alleged that, until the middle of 2018, the Woman's Home served as "a special kind of retirement home, basically a retreat from poverty and want, for elderly women who did not wish to live alone," and that it offered "a non-institutional, pleasant home-like atmosphere for its occupants." Appellee also asserted that the Woman's Home is located in an R-2 zoning district and the use of the property as a residential facility for elderly women is a nonconforming use.

{¶ 8} Appellee alleged that use of the property as a residential treatment facility constitutes a change in the Woman's Home's nonconforming use, not a mere continuation of the Woman's Home's nonconforming use. Appellee thus claimed that, because Oriana House sought to change one nonconforming use to another nonconforming use, the zoning ordinances require Oriana House to obtain a special use permit.

{¶ 9} Appellee further alleged that it notified Oriana House to apply for a special use permit, but Oriana House has not. Appellee thus asserted that the "Washington County Woman's Home is permitting an unlawful use" and "violating Marietta City zoning codes by allowing Oriana House, Inc. to continue with their renovations and plans to open a Residential Treatment Facility." Appellee additionally claimed that Oriana House is violating the zoning codes by renovating the property in anticipation of operating a residential treatment facility.

{¶ 10} Consequently, appellee requested an injunction to permanently enjoin appellants "from permitting to operate or operating a Residential Treatment Facility * * * without first obtaining a 'Special Use Permit.'"

{¶ 11} Appellants simultaneously filed an answer and a motion for summary judgment. Appellants asserted that they have obtained all required permits necessary to operate a residential treatment facility and they need not obtain a special use permit to lawfully operate a residential treatment facility. In particular, appellants raised two essential points to support their argument.

{¶ 12} First, appellants alleged that Marietta Codified Ordinances Section 1105.01 permits Oriana House to operate a residential treatment facility as a continuation of the Woman's Home's lawful nonconforming use. Appellants claimed that Section 1105.01, construed in light of the Ohio Supreme Court's decision in *Akron v. Klein*, 171 Ohio St. 207, 168 N.E.2d 564 (1960), gives Oriana House the right to operate a residential treatment facility as a continuing lawful nonconforming use. Appellants thus asserted that Oriana House's proposed use of the property as a residential treatment facility merely continues the same lawful nonconforming use of the Woman's Home's use as a residential facility for elderly women. Appellants noted that in *Klein*, the court held:

> Where a zoning ordinance provides that the lawful use of any land or premises existing at the time of its enactment may be continued as a nonconforming use, such ordinance continues the right to use land or premises in a residential-use district in a business of the same kind as, although it does not represent any continuation or part of, the particular business that was being conducted on such land or premises.

*Id.* at paragraph six of the syllabus.

{¶ 13} Appellants asserted that Oriana House's proposed use of the property as a residential treatment facility is the "same kind" of use as the Woman's Home's use as a residential

facility for elderly women. Appellants thus contended that *Klein* gives it the right to continue using the property as a lawful nonconforming use and that Oriana House need not obtain a special use permit.

{¶ 14} Appellants next argued that, even if Oriana House's nonconforming use is not the "same kind as" the Woman's Home's nonconforming use, then Section 1105.03 allows, as a matter of right, the substitution of one nonconforming use for another nonconforming use of the "same classification," so long as the party requesting the substitution obtains a use and occupancy permit. Appellants contended that: (1) Oriana House's use of the property falls within the same classification as the Woman's Home, and (2) Oriana House obtained a use and occupancy permit. Appellants further noted that appellee did not dispute either of the two foregoing points.

{¶ 15} Appellants disagreed with appellee that the zoning ordinances require Oriana House to obtain a special use permit from the Planning Commission before Oriana House can lawfully operate a residential treatment facility on the property. Appellants asserted that appellee's assertion that Oriana House must apply for, and obtain, a special use permit from the Planning Commission disregards the plain text of the zoning ordinances and results from a tortured construction of the zoning ordinances. Appellants further argued that, to the extent that the zoning ordinances are ambiguous, the court must construe them in their favor.

{¶ 16} Appellants therefore requested the trial court to conclude that appellants are not violating any zoning ordinances by proceeding with plans to operate a residential treatment facility on the property and that appellants are entitled to judgment as a matter of law.

{¶ 17} To support their summary judgment motion, appellants submitted the affidavit of James J. Lawrence, the President, Chief Executive Officer, and Executive Director of Oriana

House, Inc. Lawrence stated that Oriana House is a "nonprofit corporation which provides substance abuse treatment programs, community corrections programs, and reentry and housing programs throughout Ohio." He asserted that Oriana House "operates a residential treatment facility at the former Woman's Home" and that this facility "provides sleeping accommodations to the residents and does not use more than 25% of the floor area for central office purposes."

{¶ 18} Appellee responded and also filed a cross-motion for summary judgment. Appellee agreed with appellants that the zoning ordinances "permit[] the substitution of a nonconforming use for another nonconforming use within the same classification so long as use and occupancy permits are obtained." Appellee further agreed that Oriana House and the Woman's Home fall within the "same classification." Appellee claimed, however, that appellants' right to substitute Oriana House's nonconforming use for the Woman's Home's nonconforming use is contingent upon not only obtaining a use and occupancy permit but also upon obtaining a special use permit.

{¶ 19} Appellee argued that Section 1113.02(g) requires appellants to obtain a special use permit before Oriana House may substitute its use as a residential treatment facility for the Woman's Home's use as a residential facility for elderly women. Appellee noted that Section 1113.02(g)(4) governs uses within an R-3 district and states:

Special Permit Uses. The following uses are not permitted as a right but require special permits granted by the Planning Commission, which permits shall be issued only when the commission is satisfied that the contemplated use is not in conflict with the primary residential use.
* * * *
(4) Philanthropic or nonprofit institutions with sleeping accommodations, including nursing homes or sanitariums, provided that not more than twenty-five percent of the floor area shall be used for central office purposes.

{¶ 20} Appellee alleged that Sections 1105.03 and 1135.04 incorporate the Section

1113.02(g)(4) special-permit requirement and requires a use and occupancy permit when one nonconforming use is changed to another nonconforming use of the same classification and that Section 1135.04 sets forth the procedure for obtaining a use and occupancy permit. Appellee pointed out that Section 1135.04 states that a use and occupancy permit is required "[i]n addition to the requirements of any other ordinance." Appellee contended that this language plainly shows that "additional permitting may be required in order to change a lawful, nonconforming use." Appellee thus asserted that the "any other ordinance" language contained in Section 1135.04 incorporates Section 1113.02(g)(4) and the requirement to obtain a special use permit. Appellee concluded that because appellants did not obtain a special use permit, appellants are operating the residential treatment facility in violation of the city's zoning ordinances.

{¶ 21} Appellee did not directly respond to appellants' assertion that Section 1105.01 permits Oriana House to continue the Woman's Home's nonconforming use. Instead, appellee's arguments focused upon its contention that Oriana House's proposed use represents a change in the Woman's Home's nonconforming use. Appellee did, however, assert that *Akron v. Klein* should not apply here. Appellee claimed that, even though Oriana House's proposed nonconforming use and the Woman's Home's nonconforming use fall within the same use classification under the city's ordinances, the uses of the property are not the "same kind" because "a residential drug treatment facility is not the same 'kind' of use as a home for elderly widows." Appellee thus asserted that it is entitled to judgment as a matter of law.

{¶ 22} Appellants responded and asserted that appellee failed to set forth any evidence to show that Oriana House's proposed use of the property is not the "same kind" as the Woman's Home's nonconforming use. Appellants noted that appellee admitted that both Oriana House and

the Woman's Home are "nonprofit institutions with sleeping accommodations" that provide "not more than twenty-five percent of the floor area" for central office purposes. Appellants asserted that appellee did not bring forth any evidence to show that Oriana House's proposed use as a "nonprofit institutions with sleeping accommodations" differed from the Woman's Home's use as a "nonprofit institutions with sleeping accommodations," and that appellee's conclusory allegations that a residential treatment facility differs from a residential facility for elderly women is not proper Civ.R. 56 evidence. Thus, appellants contended that no genuine issues of material fact remain as to whether Oriana House's proposed use and the Woman's Home's use are the "same kind," i.e., "nonprofit institutions with sleeping accommodations." Appellants argued that, as a matter of law, Oriana House's proposed use is a continuation of the Woman's Home's nonconforming use.

{¶ 23} Appellants further asserted that nothing in the zoning ordinances indicates that Oriana House must apply for a special use permit when continuing a lawful nonconforming use. They observed that appellee did not claim that Oriana House must apply for a special use permit if merely continuing a lawful nonconforming use. Appellants thus asserted that appellee's contention that Oriana House must apply for a special use permit is baseless.

{¶ 24} Appellants alternatively argued that, even if Oriana House's proposed nonconforming use of the property represents a change in the Woman's Home's nonconforming use, Section 1105.03 allows one nonconforming use to be substituted for another nonconforming use of the same classification once as a matter of right upon obtaining a use and occupancy permit. Appellants noted that appellee agrees that the Woman's Home's nonconforming use and Oriana House's proposed nonconforming use are in the same classification, and that appellee agrees that

appellants obtained a use and occupancy permit. Appellants therefore contended that Oriana House obtained all necessary permits.

{¶ 25} Appellants, however, disputed appellee's claim that Oriana House also must obtain a special use permit. Appellants argued that the plain terms of the zoning ordinances show that Oriana House has obtained all required permits, and that the zoning ordinances do not unambiguously require Oriana House to obtain a special use permit as appellee asserts. Appellants therefore argued that they are entitled to judgment as a matter of law because they have complied with all permitting requirements and they did not violate the zoning ordinances.

{¶ 26} On September 11, 2019, the trial court overruled appellants' summary judgment motion and sustained appellee's motion. The trial court: (1) determined that the express language of the zoning ordinances requires appellants to obtain a special use permit in order to operate a residential treatment facility on the property, and (2) rejected appellants' assertion that their use of the property as a residential treatment facility is the same kind of use as the former Woman's Home, a "multi-family home for elderly women." The court thus permanently enjoined appellants from operating a residential treatment facility without first obtaining a special use permit. This appeal followed.

{¶ 27} Appellants first and second assignments of error challenge the propriety of the trial court's summary judgment.[1] Appellant's third assignment of error contends that the trial court

---

[1] We observe that appellants' brief argues the first and second assignments of error together. While appellate courts may combine assignments of error, the Appellate Rules require an appellant's brief to separately argue each assignment of error. App.R. 16(A)(7) (stating that "[t]he appellant shall include in its brief * * * [a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies"); *State v. Rife*, 4th Dist. Ross No. 11CA3276, 2012-Ohio-3264, 2012 WL 2928546, ¶ 15. We thus would be within our discretion to disregard appellants' first and second assignments of error. *See* App.R. 12(A)(2) (stating that court may disregard an assignment of error if appellant fails to separately argue it). We prefer, however,

incorrectly granted appellee's request for an injunction. Because appellants' three assignments of error revolve around one basic issue of whether the trial court correctly construed the zoning ordinances and because all three assignments of error rely upon the same general principles, we have combined our review of the three assignments of error.

{¶ 28} In their first assignment of error, appellants contend that the trial court erred by granting appellee summary judgment. In their second assignment of error, appellants argue that the trial court erred by denying their motion for summary judgment. In particular, appellants assert that the trial court incorrectly construed the zoning ordinances to conclude that appellants are violating the zoning ordinances by operating, or planning to operate, a residential treatment facility without obtaining a special use permit. Appellants allege that the zoning ordinances do not clearly and unambiguously require them to obtain a special use permit before they can lawfully operate a residential treatment facility. Appellants thus argue that the trial court erred by concluding that appellee is entitled to judgment as a matter of law.

{¶ 29} In their third assignment of error, appellants assert that the trial court improperly granted appellee's request for an injunction. Appellants contend that the trial court's decision to grant appellee an injunction is based upon an erroneous interpretation of the zoning ordinances.

A

STANDARD OF REVIEW

{¶ 30} Initially, we note that appellate courts conduct a de novo review of trial court

---

to decide cases on their merits rather than procedural technicalities. *Barksdale v. Van's Auto Sales, Inc.*, 38 Ohio St.3d 127, 128, 527 N.E.2d 284, 285 (1988) (noting that a "basic tenet of Ohio jurisprudence [is] that cases should be determined on their merits and not on mere procedural technicalities"). We therefore will review appellants' first and second assignments of error.

summary judgment decisions.  *E.g., State ex rel. Novak, L.L.P. v. Ambrose*, 156 Ohio St.3d 425, 2019-Ohio-1329, 128 N.E.3d 209, ¶ 8; *Pelletier v. Campbell*, 153 Ohio St.3d 611, 2018-Ohio-2121, 109 N.E.3d 1210, ¶ 13; *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Accordingly, an appellate court must independently review the record to determine if summary judgment is appropriate and need not defer to the trial court's decision. *Grafton*, 77 Ohio St.3d at 105.

{¶ 31} Civ.R. 56(C) provides, in relevant part, as follows:

> * * * * Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  No evidence or stipulation may be considered except as stated in this rule.  A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor.

{¶ 32} Accordingly, pursuant to Civ.R. 56, a trial court may not award summary judgment unless the evidence demonstrates that: (1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) after viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion, and that conclusion is adverse to the nonmoving party.  *Pelletier* at ¶ 13; *M.H. v. Cuyahoga Falls*, 134 Ohio St.3d 65, 2012-Ohio-5336, 979 N.E.2d 1261, ¶ 12; *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977).

{¶ 33} "As to materiality, the substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *accord*

*Byrd v. Smith*, 110 Ohio St.3d 24, 2006-Ohio-3455, 850 N.E.2d 47, ¶ 12; *Turner v. Turner*, 67 Ohio St.3d 337, 340, 617 N.E.2d 1123 (1993); *Bender v. Logan*, 4th Dist. No. 14CA3677, 2016-Ohio-5317, 76 N.E.3d 336, 2016 WL 4208549, ¶ 49.

B

R.C. 713.13

{¶ 34} In the case sub judice, R.C. 713.13 is the starting point for evaluating the parties' cross-summary judgment motions regarding appellee's request for an injunction. R.C. 713.13 allows a municipal corporation to seek an injunction to prevent or terminate violations of its zoning ordinances or regulations. The statute provides as follows:

> No person shall erect, construct, alter, repair, or maintain any building or structure or use any land in violation of any zoning ordinance or regulation enacted pursuant to sections 713.06 to 713.12, inclusive, of the Revised Code, or Section 3 of Article XVIII, Ohio Constitution. In the event of any such violation, or imminent threat thereof, the municipal corporation, * * * in addition to any other remedies provided by law, may institute a suit for injunction to prevent or terminate such violation.

{¶ 35} Before a court may grant summary judgment regarding an R.C. 713.13 injunction, a city must establish that no genuine issues of material fact remain as to whether "the statutory conditions exist." *Ackerman v. Tri-City Geriatric & Health Care, Inc.*, 55 Ohio St.2d 51, 58, 378 N.E.2d 145 (1978); *accord Columbus v. Galli*, 10th Dist. Franklin No. 12AP-864, 2013-Ohio-5325, 2013 WL 6406317, ¶ 10. Thus, to be entitled to summary judgment, a city must show that no genuine issues of material fact remain that a person erected, constructed, altered,

repaired, or maintained any building or structure or used any land in violation of (or poses an imminent threat of violating) any zoning ordinance or regulation.[2]

{¶ 36} Conversely, for a property owner to be entitled to summary judgment regarding a city's request for an R.C. 713.13 injunction, a property owner must establish that reasonable minds could only conclude that the property owner does not pose an imminent threat of violating the zoning ordinances.

{¶ 37} In the case at bar, appellee asserts that appellants are violating the zoning ordinances by planning to operate a residential treatment facility without obtaining a special use permit from the Planning Commission. Resolving the issue requires that we ascertain the meaning of the zoning ordinances.

C

INTERPRETATION OF ZONING ORDINANCES

{¶ 38} The interpretation of a zoning ordinance raises a question of law that appellate courts review independently and without deference to the trial court. *Cleveland Clinic Found. v. Cleveland Bd. of Zoning Appeals*, 141 Ohio St.3d 318, 2014-Ohio-4809, 23 N.E.3d 1161, ¶ 25; *Lang v. Ohio Dept. of Job & Family Servs.*, 134 Ohio St.3d 296, 2012-Ohio-5366, 982 N.E.2d 636, ¶ 12 (noting that "[a] question of statutory construction presents an issue of law that we determine de novo on appeal").

{¶ 39} Courts that review the meaning of a zoning ordinance apply the "standard rules of

---

[2] We observe that "when a statute grants a specific injunctive remedy to an individual or to the state, the party requesting the injunction 'need not aver and show, as under ordinary rules in equity, that great or irreparable injury is about to be done for which he has no adequate remedy at law * * *.'" *Ackerman v. Tri-City Geriatric & Health Care, Inc.*, 55 Ohio St.2d 51, 56, 378 N.E.2d 145 (1978), quoting *Stephan v. Daniels*, 27 Ohio St. 527, 536 (1875).

statutory construction." *Gesler v. Worthington Income Tax Bd. of Appeals*, 138 Ohio St.3d 76, 2013-Ohio-4986, 3 N.E.3d 1177, ¶ 12; *accord Shampton v. Springboro*, 98 Ohio St.3d 457, 2003-Ohio-1913, 786 N.E.2d 883, ¶ 30. A court's primary goal when determining the meaning of a zoning ordinance is to give effect to the enacting body's intent. *State v. Bryant*, ⸺ Ohio St.3d ⸺, 2020-Ohio-1041, ⸺ N.E.3d ⸺, ¶ 12; *Cleveland Clinic Found. v. Cleveland Bd. of Zoning Appeals*, 141 Ohio St.3d 318, 2014-Ohio-4809, 23 N.E.3d 1161, ¶ 29. To determine intent, "we first look to the text of the [ordinance]." *State v. Pendergrass*, ⸺ Ohio St.3d ⸺, 2020-Ohio-3335, ⸺ N.E.3d ⸺, ¶ 5.

{¶ 40} When the ordinance's text clearly and unambiguously reveals intent, courts must apply the ordinance as written. *Wilson v. Lawrence*, 150 Ohio St.3d 368, 2017-Ohio-1410, 81 N.E.3d 1242, ¶ 11; *Wingate v. Hordge*, 60 Ohio St.2d 55, 58, 396 N.E.2d 770 (1979), citing *Provident Bank v. Wood*, 36 Ohio St.2d 101, 304 N.E.2d 378 (1973). Accordingly, a court's first step when considering the meaning of an ordinance "is always to determine whether the [ordinance] is 'plain and unambiguous.'" *Jacobson v. Kaforey*, 149 Ohio St.3d 398, 2016-Ohio-8434, 75 N.E.3d 203, ¶ 8, quoting *State v. Hurd*, 89 Ohio St.3d 616, 618, 734 N.E.2d 365 (2000); *see also State ex rel. Cordray v. Midway Motor Sales, Inc.*, 122 Ohio St.3d 234, 2009-Ohio-2610, 910 N.E.2d 432, ¶ 15, quoting *Slingluff v. Weaver*, 66 Ohio St. 621, 64 N.E. 574 (1902), paragraph two of the syllabus (stating that if words used in statute or administrative rule "'be free from ambiguity and doubt, and express plainly, clearly and distinctly, the sense of the law-making body, there is no occasion to resort to other means of interpretation'"). "'If [the ordinance] is not ambiguous, then we need not interpret it; we must simply apply it.'" *Wilson* at ¶ 11, quoting *State v. Hairston*, 101 Ohio St.3d 308, 2004-Ohio-969, 804 N.E.2d 471, ¶ 13. When

the language used in an ordinance "'is plain and unambiguous, and conveys a clear and definite meaning, we must rely on what the [legislative body] has said.'" *Id.*, quoting *Jones v. Action Coupling & Equip., Inc.*, 98 Ohio St.3d 330, 2003-Ohio-1099, 784 N.E.2d 1172, ¶ 12, citing *Symmes Twp. Bd. of Trustees v. Smyth*, 87 Ohio St.3d 549, 553, 721 N.E.2d 1057 (2000).

{¶ 41} Additionally, courts must "give effect only to the words the legislature used, making neither additions to, nor deletions from, the statutory language." *Id.*, citing *Columbia Gas Transm. Corp. v. Levin*, 117 Ohio St.3d 122, 2008-Ohio-511, 882 N.E.2d 400, ¶ 19. Furthermore, "'[t]he interpretation of statutes and administrative rules should follow the principle that neither is to be construed in any way other than as the words demand.'" *State ex rel. Baroni v. Colletti*, 130 Ohio St.3d 208, 2011-Ohio-5351, 957 N.E.2d 13, ¶ 18, quoting *Morning View Care Ctr.–Fulton v. Ohio Dept. of Human Servs.*, 148 Ohio App.3d 518, 2002-Ohio-2878, 774 N.E.2d 300, ¶ 36 (10th Dist.). We also observe that when a legislative "definition is available, we construe the words of the statute accordingly." *State v. Gonzales*, 150 Ohio St.3d 276, 2017-Ohio-777, 81 N.E.3d 419, ¶ 4, citing R.C. 1.42; *accord Stewart v. Vivian*, 151 Ohio St.3d 574, 2017-Ohio-7526, 91 N.E.3d 716, ¶ 25. Moreover, R.C. 1.42 specifies that courts reviewing statutes and ordinances must read "[w]ords and phrases * * * in context" and "construe[ them] according to the rules of grammar and common usage."

{¶ 42} When the language of an ordinance is ambiguous, a court may then consider rules of construction to determine legislative intent. *Turner v. Hooks*, 152 Ohio St.3d 559, 2018-Ohio-556, 99 N.E.3d 354, ¶ 10*; Symmes Twp. Bd. of Trustees v. Smyth*, 87 Ohio St.3d 549, 553, 721 N.E.2d 1057 (2000). "A statute is ambiguous '"if a reasonable person can find different meanings in the [ordinance] and if good arguments can be made for either of two contrary

positions.'"'" *Turner* at ¶ 12, quoting *Sunset Estate Properties, L.L.C. v. Lodi*, 9th Dist. Medina No. 12CA0023-M, 2013-Ohio-4973, 2013 WL 6021470, ¶ 20, quoting *4522 Kenny Rd., L.L.C., v. Columbus Bd. of Zoning Adjustment*, 152 Ohio App.3d 526, 2003-Ohio-1891, 789 N.E.2d 246, ¶ 13 (10th Dist.).

{¶ 43} R.C. 1.49 lists several factors that a court may consider when determining the legislative intent of an ambiguous statute. *Symmes*, 87 Ohio St.3d at 556 (stating that R.C. 1.49 sets forth "specific guideposts for courts to follow when interpreting ambiguous statutes"). The statute provides as follows:

If a statute is ambiguous, the court, in determining the intention of the legislature, may consider among other matters:
(A) The object sought to be attained;
(B) The circumstances under which the statute was enacted;
(C) The legislative history;
(D) The common law or former statutory provisions, including laws upon the same or similar subjects;
(E) The consequences of a particular construction;
(F) The administrative construction of the statute.

{¶ 44} A court that is determining the meaning of an ambiguous statute "may consider laws upon the same or similar subjects in order to determine legislative intent." *D.A.B.E., Inc. v. Toledo-Lucas Cty. Bd. of Health*, 96 Ohio St.3d 250, 2002-Ohio-4172, 773 N.E.2d 536, ¶ 20, citing R.C. 1.49(D). "'Statutes relating to the same matter or subject, although passed at different times and making no reference to each other, are in pari materia and should be read together to ascertain and effectuate if possible the legislative intent.'" *Id.*, quoting *State ex rel. Pratt v. Weygandt*, 164 Ohio St. 463, 132 N.E.2d 191 (1956), paragraph two of the syllabus. Additionally, a court that is considering statutes in pari materia "must arrive at a reasonable construction giving the proper force and effect, if possible, to each statute." *Id.*, citing *Maxfield v. Brooks*, 110 Ohio St. 566,

144 N.E. 725 (1924), paragraph two of the syllabus.

{¶ 45} Furthermore, "when applying a zoning provision, a court must not view the provision in isolation; rather, its 'meaning should be derived from a reading of the provision taken in the context of the entire ordinance.'" *Cleveland Clinic Found. v. Cleveland Bd. of Zoning Appeals*, 141 Ohio St.3d 318, 2014-Ohio-4809, 23 N.E.3d 1161, ¶ 35, quoting *Univ. Circle, Inc. v. Cleveland*, 56 Ohio St.2d 180, 184, 383 N.E.2d 139, 141 (1978).

{¶ 46} We also observe that when interpreting a zoning ordinance, courts must strictly construe restrictions on the use of real property in favor of the property owner. In *Terry v. Sperry*, 130 Ohio St.3d 125, 2011-Ohio-3364, 956 N.E.2d 276, ¶ 19, the Ohio Supreme Court explained:

> Zoning resolutions are in derogation of the common law and deprive a property owner of certain uses of his land to which he would otherwise be lawfully entitled. Therefore, such resolutions are ordinarily construed in favor of the property owner. Restrictions on the use of real property by ordinance, resolution or statute must be strictly construed, and the scope of the restrictions cannot be extended to include limitations not clearly prescribed.

*Accord Cleveland Clinic Found.* at ¶ 34; *Univ. Circle,* 56 Ohio St.2d at 184. "In other words, [Ohio law] do[es] not permit zoning 'limitations by implication.'" *Cleveland Clinic Found.* at ¶ 34, quoting *Henley*, 90 Ohio St.3d at 152, 735 N.E.2d 433.

{¶ 47} In accordance with the foregoing principles, we begin with the text of the city's zoning ordinances to determine whether, as appellee argues, the language clearly and unambiguously requires Oriana House to obtain a special use permit from the Planning Commission before it can lawfully operate a residential treatment facility on the premises.

D

MARIETTA ZONING ORDINANCES

{¶ 48} The city's zoning ordinances are contained in Part Eleven, Title One of the Codified Ordinance. Section 1101.02 sets forth the zoning code's general compliance requirements. Section 1101.02(b) governs "[e]xisting [u]ses" and provides:

> In all districts, after the effective date of this Zoning Ordinance, and except as otherwise provided in Chapter 1105:
> (1) The existing use of any existing building or other structure may be continued, changed or extended; and
> (2) The existing use of any tract of land may be continued, changed or enlarged; and
> (3) Any existing building or other structure may be enlarged, altered, converted, reconstructed or relocated, only in accordance with this Zoning Ordinance.

{¶ 49} Thus, Chapter 1105 applies when an existing use of existing property is continued, changed, or enlarged.

{¶ 50} Chapter 1105 is entitled "Nonconforming Uses." Section 1105.01 allows a lawful nonconforming use to be continued. The provision reads:

> Any building or other structure, or any use of a building or other structure or land, existing on the effective date of this Zoning Ordinance and which complies with zoning ordinances in effect immediately prior to the adoption of this Zoning Ordinance, which does not conform with the provisions of this Zoning Ordinance, shall be considered a lawful nonconforming building, structure or use, and may be continued, except as otherwise provided herein.

Section 1105.03 governs changes to nonconforming uses:

> Any lawful nonconforming use of a building or land may be changed to another nonconforming use of the same classification once as a matter of right, provided that before any such change may occur the party desiring the same shall obtain a use and occupancy permit pursuant to Section 113[5].04. Subsequent changes of any lawful nonconforming use of a building or land to another nonconforming use of the same classification shall be permitted only upon the

granting of a special exception by the Planning Commission in those instances where the Planning Commission shall find that granting the special exception shall not materially adversely affect the health or safety of persons residing or working in the neighborhood of the proposed use and shall not be materially detrimental to the public welfare or injurious to property or improvements in such neighborhood. Whenever a nonconforming use of a building or land has been changed to a conforming use, such conforming use shall not thereafter be changed to a nonconforming use. As used herein the term "classification" shall be interpreted to include any use permiss[i]ble within the appropriate zoning district (see Section 1101.03) and the term "change" shall not be interpreted to include any transfer of ownership.

Section 1135.04, entitled Use and Occupancy Permits Required, states:

> In addition to the requirements of any other ordinance, a use and occupancy permit shall be required prior to any of the following:
> * * * *
> (b) Change in use of any building or structure;
> * * * *
> (d) Change in use or extension of a nonconforming use; or
> (e) Change of ownership of any land or building.
> No person shall use or occupy any building or other structure or land until any required use and occupancy permit has been duly issued. * * * *

{¶ 51} In the case at bar, the parties agree that the Woman's Home's use of the property as a residential facility is a lawful nonconforming use. The parties further agree, for purposes of Section 1105.03, that Oriana House's proposed use of the property as a residential treatment facility falls within the "same classification" as the Woman's Home's nonconforming use of the property. In particular, the parties agree that the Woman's Home's nonconforming use of the

property and Oriana House's proposed nonconforming use of the property fit the use classification set forth in Section 1113.02(g)(4).

{¶ 52} Section 1113.02(g)(4) is contained within the use regulations governing property located in an R-3 Residential District.   The provision states:

> (g) Special Permit Uses.   The following uses are not permitted as a right but require special permits granted by the Planning Commission, which permits shall be issued only when the Commission is satisfied the contemplated use is not in conflict with the primary residential use.
> * * * *
> (4) Philanthropic or nonprofit institutions with sleeping accommodations, including nursing homes or sanitariums, provided that not more than twenty-five percent of the floor area shall be used for central office purposes.
> * * * *.

{¶ 53} The parties agree that the Woman's Home's nonconforming use and Oriana House's proposed nonconforming use of the property are "nonprofit institutions with sleeping accommodations" and that "not more than twenty-five percent of the floor area" is dedicated to central office purposes.   At this point, however, the parties' arguments diverge.

{¶ 54} Appellee contends that (1) Section 1105.03 applies because Oriana House's proposed nonconforming use is a change in the Woman's Home's nonconforming use; (2) Section 1105.03 requires Oriana House to obtain a use and occupancy permit in accordance with Section 1135.04; and (3) Section 1135.04, in turn, requires Oriana House to obtain a use and occupancy permit and to comply with "the requirements of any other ordinance."   Appellee then claims that Section 1113.02(g)(4) is "any other ordinance."

{¶ 55} Appellee recognizes that Section 1113.02(g)(4) applies to uses of property located in an R-3 residential district and that the Woman's Home is located in an R-2 residential district. Appellee nevertheless asserts that Section 1113.02(g)(4) applies because Oriana House is seeking

to change the Woman's Home's nonconforming use to a use that requires the Planning Commission to grant a special use permit. Appellee thus contends that the zoning ordinances unambiguously require Oriana House to obtain a special use permit before it can lawfully operate a residential treatment facility on the premises.

{¶ 56} Appellants, on the other hand, argue that the zoning ordinances do not unambiguously require Oriana House to obtain a special use permit before it can lawfully operate a residential treatment facility. Appellants first assert that Section 1105.01, not Section 1105.03, applies. Appellants contend that Oriana House's proposed nonconforming use is a mere continuation of (not a change in) the Woman's Home's nonconforming use. Appellants thus argue that the zoning ordinances do not require Oriana House to obtain a special use permit from the Planning Commission when merely continuing a lawful nonconforming use of the property.

{¶ 57} Appellants also contend that *Akron v. Klein, supra,* mandates this conclusion. Appellants observe that in *Klein*, the Ohio Supreme Court held:

> Where a zoning ordinance provides that the lawful use of any land or premises existing at the time of its enactment may be continued as a nonconforming use, such ordinance continues the right to use land or premises in a residential-use district in a business of the same kind as, although it does not represent any continuation or part of, the particular business that was being conducted on such land or premises at the time of enactment of such zoning ordinance.

*Id.*, paragraph six of the syllabus.

{¶ 58} Appellants assert that Oriana House's use is the "same kind" of use as the Woman Home's use. To support their assertion, appellants cite Section 1113.02(g)(4) and state that both the Woman's Home and Oriana House are "[p]hilanthropic or nonprofit institutions with sleeping accommodations" and that neither uses "more than twenty-five percent of the floor area * * * for central office purposes." Appellants claim that because both uses share the same use

classification under the zoning code, then the uses are the "same kind."

{¶ 59} Appellants assert that the trial court misconstrued the *Klein* decision and failed to appreciate the distinction between the continuation of a lawful nonconforming use and a change in use. Appellants contend that Oriana House's proposed nonconforming use simply is a continuation of the Woman's Home's nonconforming use as a nonprofit institution with sleeping accommodations. Appellants thus claim that the trial court construed the phrase "same kind as" too narrowly.

{¶ 60} Appellants alternatively assert that if Section 1105.03 applies, the trial court incorrectly interpreted it and related provisions to determine that Oriana House must obtain a special use permit from the Planning Commission before Oriana House can lawfully operate a residential treatment facility on the property. Appellants argue that neither Section 1105.03, nor any of the related provisions, unambiguously requires Oriana House to obtain a special use permit from the Planning Commission.

{¶ 61} Appellants agree with appellee that the Woman's Home's nonconforming use as a residential facility for elderly women and Oriana House's intended nonconforming use as a residential treatment facility fall within the same R-3 zoning district use classification, i.e., Section 1113.02(g)(4), but contend that because the Woman's Home's use and Oriana House's intended use fall within the same classification, Section 1105.03 permits the change in use as a matter of right. Appellants assert that nothing in Section 1105.03, or the chapter governing nonconforming uses, imposes an additional requirement to obtain a special use permit. Appellants further argue that appellee's reasoning that they must comply with Section 1113.02(g)(4) (a zoning regulation governing R-3 uses) is nonsensical when the property at issue is located in an R-2 district.

{¶ 62} Appellants additionally note that Section 1105.03 sets forth the circumstances when a change in a lawful nonconforming use requires a special use permit. The second sentence of Section 1105.03 states:

Subsequent changes of any lawful nonconforming use of a building or land to another nonconforming use of the same classification shall be permitted only upon the granting of a special exception by the Planning Commission * * *.

{¶ 63} Appellants assert that the ordinance thus means that a special use permit need only be obtained if a change in use is sought after a change in use already occurred once as a matter of right.

{¶ 64} Accordingly, to be entitled to summary judgment, the city must establish two points: (1) that Oriana House is seeking to change the Woman's Home's nonconforming use to another nonconforming use of the same classification; and (2) that the zoning ordinances unambiguously require Oriana House to obtain a special use permit before it can lawfully change the Woman's Home's nonconforming use as a residential facility for elderly women to a residential treatment facility.

E

NONCONFORMING USE PRINCIPLES

{¶ 65} We first note that the parties do not dispute that the Woman's Home's use of the property is a lawful nonconforming use. A nonconforming use means a use that "was lawful prior to the enactment of a zoning ordinance and which use may be continued after the effective date of the ordinance even though it does not comply with the applicable use restrictions." *C.D.S., Inc. v. Village of Gates Mills*, 26 Ohio St.3d 166, 168, 497 N.E.2d 295 (1986); *accord* Marietta Zoning Code of Ordinances, Section 1101.01(v) ("'[n]onconforming building, use or lot' means a lawful

building, use or lot which, by reason of design, size or use, does not conform with the requirement of the district or districts in which it is located as designated by this Zoning Ordinance"). The use of land qualifies as a lawful nonconforming use when: (1) the use existed before the enactment prohibiting the use, and (2) the use was lawful at the time the use began. *Pschesang v. Terrace Park*, 5 Ohio St.3d 47, 448 N.E.2d 1164 (1983), syllabus; *Dublin v. Finkes*, 83 Ohio App.3d 687, 690, 615 N.E.2d 690 (10th Dist.1992).

{¶ 66} In the case at bar, the parties agree that the Woman's Home's use as a residential facility for elderly women existed before the city enacted the zoning ordinances that prohibited the use in the zoning district where the Woman's Home is located (i.e., an R-2 Residential District). The parties further agree that the Woman's Home's use was lawful at the time the use began. Thus, no dispute exists that the Woman's Home's use is a lawful nonconforming use.

{¶ 67} Nonconforming uses are not, however, "favorites of the law," and they are allowed to exist and continue due to "constitutional prohibitions against immediate termination of the use." *Aluminum Smelting & Refining Co. v. Denmark Tp. Zoning Bd. Of Zoning Appeals*, 11th Dist. Ashtabula No. 2001-A-0050, 2002-Ohio-6690, 2002 WL 31743011, ¶ 14, citing *Kettering v. Lamar Outdoor Advertising, Inc.*, 38 Ohio App.3d 16, 17, 525 N.E.2d 836 (1987). Nonconforming uses "may be regulated, and even girded to the point that they wither and die." *Columbus v. Union Cemetery Assn.*, 45 Ohio St.2d 47, 49, 341 N.E.2d 298 (1976).

{¶ 68} A party nevertheless has a constitutionally protected "right to continue to use one's property in a lawful business and in a manner which does not constitute a nuisance and which was lawful at the time such business was established." *Akron v. Chapman* (1953), 160 Ohio St. 382, 52 O.O. 242, 116 N.E.2d 697, paragraph two of the syllabus. "An existing use is said to be the

subject of a vested right in the user.  As such, to prohibit such use by enforcing subsequently enacted zoning ordinances would amount to the taking of the user's property without due process of law."  *C.D.S., Inc.*, 26 Ohio St.3d at 169, fn. 2 (citations omitted).

{¶ 69} Additionally, when "a zoning ordinance provides that the lawful use of any land or premises existing at the time of its enactment may be continued as a nonconforming use, such ordinance continues the right to use land or premises in a residential use district in a business of the same kind as, although it does not represent any continuation or part of, the particular business that was being conducted on such land or premises at the time of enactment of such zoning ordinance."  *Klein*, 171 Ohio St. at 216.

{¶ 70} Moreover, "[w]here a zoning resolution provides that an existing and nonconforming use may be continued but contains no provision as to a permit therefor, it is not necessary as a condition precedent to such continuance to secure from the zoning authorities such a permit."  *State v. Pierce*, 164 Ohio St. 482, 132 N.E.2d 102 (1956), paragraph one of the syllabus.  "In other words, where a use exists at the time a zoning resolution or ordinance takes effect, which makes such use nonconforming and does not provide for an application to continue such use, such use may be continued under the terms of the ordinance or resolution, and a permit to continue such nonconforming use is not required."  *Id.* at 487 (citations omitted).

{¶ 71} We further observe that "[a] change in the ownership or tenancy of a nonconforming business or structure generally does not affect the right to continue the nonconforming use because the right attaches to the land itself."  *Beth Jacob Congregation v. City of Huber Hts. Bd. of Zoning Appeals*, 2nd Dist. Montgomery No. 16650, 1998 WL 125568, *4 (citations omitted); *accord Herres v. Harrison Twp. Bd. of Trustees*, 2nd Dist. Montgomery No. 23668, 2010-Ohio-3909,

2010 WL 3292047, ¶ 17 (stating that "a legal nonconforming use passes to successive owners"); *see also Eitnier v. Kreitz Corp.*, 404 Pa. 406, 172 A.2d 320, 323 (1961) (holding that "[t]he right to continue the nonconforming use, once established and not abandoned, runs with the land and this right is not confined to any one individual or corporation. A vested right, unless abandoned, to continue the nonconforming use is in the land"); Edward H. Ziegler, Jr., 4 Rathkopf's The Law of Zoning and Planning, Section 72:20 (4th ed.2003) (recognizing the right to continue a nonconforming use as an attribute of land ownership exercisable by a property purchaser); Kenneth H. Young, Anderson's American Law of Zoning, Section 6:40 (4th ed.1996) ("The right [to maintain a nonconforming use] attaches to the land itself * * * * [and] can be exercised equally by the purchaser."). "An established nonconforming use runs with the land, and hence a change in ownership will not destroy the right to continue the use." 8A Eugene McQuillin, The Law of Mun. Corp. § 25.188, at 59 (3d ed. 2018). "However, generally speaking, the character of the nonconforming use must be the same for the change in ownership not to effect a valid nonconforming use." *Id.* Zoning ordinances may, however, limit the "future expansion" of a lawful nonconforming use or the "future addition, extension or substitution of buildings" that house lawful nonconforming uses. *Chapman, supra,* paragraph one of the syllabus. Thus, courts have upheld "the denial of the right [1] to extend or enlarge an existing nonconforming use," "[2] to substitute new buildings for those devoted to an existing nonconforming use and [3] to add or extend such buildings." *Id.* at 386-387 (citations omitted).

{¶ 72} R.C. 713.15 codifies the protections afforded nonconforming uses. The statute provides as follows:

> The lawful use of any dwelling, building, or structure and of any land or

premises, as existing and lawful at the time of enacting a zoning ordinance or an amendment to the ordinance, may be continued, although such use does not conform with the provisions of such ordinance or amendment, but if any such nonconforming use is voluntarily discontinued for two years or more, or for a period of not less than six months but not more than two years that a municipal corporation otherwise provides by ordinance, any future use of such land shall be in conformity with sections 713.01 to 713.15 of the Revised Code. The legislative authority of a municipal corporation shall provide in any zoning ordinance for the completion, restoration, reconstruction, extension, or substitution of nonconforming uses upon such reasonable terms as are set forth in the zoning ordinance.

F

SECTION 1105.03

{¶ 73} In the case at bar, appellee asserts that Section 1105.03 contains reasonable terms that set forth the procedure for Oriana House to substitute the Woman's Home's nonconforming use of the property for another nonconforming use of the same classification. Appellee argues that Section 1105.03, when read in conjunction with Sections 1134.05 and 1113.02(g)(4), unambiguously requires Oriana House to obtain a special use permit in addition to a use and occupancy permit.

{¶ 74} We again note that Section 1105.03 states:

Any lawful nonconforming use of a building or land may be changed to another nonconforming use of the same classification once as a matter of right,

provided that before any such change may occur the party desiring the same shall obtain a use and occupancy permit pursuant to Section 113[5].04. * * * * As used herein the term "classification" shall be interpreted to include any use permiss[i]ble within the appropriate zoning district (see Section 1101.03) and the term "change" shall not be interpreted to include any transfer of ownership.

{¶ 75} Additionally, Section 1135.04, entitled Use and Occupancy Permits Required, states:

> In addition to the requirements of any other ordinance, a use and occupancy permit shall be required prior to any of the following:
> * * * *
> (b) Change in use of any building or structure;
> * * * *
> (d) Change in use or extension of a nonconforming use; or
> (e) Change of ownership of any land or building.
> No person shall use or occupy any building or other structure or land until any required use and occupancy permit has been duly issued. * * * *

{¶ 76} Appellee argues that the phrase "[i]n addition to the requirements of any other ordinance" unambiguously incorporates Section 1113.02(g)(4) and the requirement that Oriana House obtain a special use permit from the Planning Commission. We, however, do not agree with appellee that the phrase "[i]n addition to the requirements of any other ordinance" unambiguously means that Oriana House must comply with the special-use permit requirement before it can lawfully operate a residential treatment center on the property. We nevertheless conclude that Section 1105.03 leads to this same conclusion.

{¶ 77} Section 1105.03 defines the term "classification" to mean "any use permiss[i]ble within the appropriate zoning district (see Section 1101.03)." Inserting this definition into the text of Section 1105.03 suggests that Section 1105.03 means that "[a]ny lawful nonconforming

use of a building or land may be changed to another nonconforming use of the same [use permiss[i]ble within the appropriate zoning district (see Section 1101.03)] once as a matter of right." It also could mean, however, "[a]ny lawful nonconforming use of a building or land may be changed to another nonconforming use of [any use permiss[i]ble within the appropriate zoning district (see Section 1101.03)] once as a matter of right." For purposes of our decision, however, either definition suffices.

{¶ 78} In the case at bar, the parties agree that the Woman's Home's nonconforming use of the property fits the use classification under Section 1113.02(g)(4) and that Section 1113.02(g)(4) is contained within the zoning ordinance governing uses in an R-3 zoning district. Thus, under Section 1105.03's definition of "classification," the "appropriate zoning district" is an R-3 zoning district. *See generally Tausch v. Parker*, 217 N.Y.S.2d 953, 956 (Sup. Ct.1961), citing Rathkopf—The Law of Zoning and Planning, Third Edition, Vol. 2, page 58–24 (stating that "[t]he words 'same classification' have been held to mean another use specified as a permitted use in the district in which the nonconforming use is a permitted use").

{¶ 79} Section 1105.03 therefore permits the Woman's Home's lawful nonconforming use to be changed to another nonconforming use of the "same classification," i.e., either the same use permitted in an R-3 General Residential District or any use permitted in an R-3 General Residential District.

{¶ 80} Section 1113.02 sets forth the uses that are allowed in an R-3 district and states as follows:

A building may be erected, altered or used, and a lot may be used or occupied only for the following purposes in any "R-3" Residential District:
(a) A use permitted in an "R-2" Residential District.
(b) Single-family semidetached dwellings.

(c) Two-family detached dwellings.

(d) Town houses (also known as row houses and which consist of three or more completely separate single-family dwelling units having common walls joining them into one structural unit), not to exceed six dwellings per structural unit.

(e) Multiple-family dwellings and apartment houses.

(f) Accessory uses.

(g) Special Permit Uses. The following uses are not permitted as a right but require special permits granted by the Planning Commission, which permits shall be issued only when the Commission is satisfied the contemplated use is not in conflict with the primary residential use.

(1) Health Centers.

(2) Medical offices or group medical centers, including the practice of dentistry, osteopathy, podiatry, psychology or chiropody, limited to a location below the level of the first story ceiling, except that in multiple family dwellings such uses may be located on the second floor, if separate access to the outside is provided.

(3) Nonprofit or voluntary hospitals or related hospital facilities including animal hospitals.

(4) Philanthropic or nonprofit institutions with sleeping accommodations, including nursing homes or sanitariums, provided that not more than twenty-five percent of the floor area shall be used for central office purposes.

(5) Proprietary nursing homes or sanitariums.

(6) Residential facilities for the mentally retarded or developmentally disabled as licensed by the State of Ohio.

{¶ 81} In the case at bar, the parties agree that Oriana House's proposed nonconforming use falls within the same R-3 use classification as the Woman's Home's nonconforming use, i.e., Section 1113.02(g)(4). Section 1113.02(g)(4) allows property to be used as a "[p]hilanthropic or nonprofit institution[] with sleeping accommodations" in an R-3 zoning district, but only if the Planning Commission grants a special use permit. Thus, although Oriana House's proposed use is a permissible use in an R-3 zoning district, it is permissible only if the Planning Commission grants a special use permit.

{¶ 82} We again point out that Section 1105.03 permits one nonconforming use to be changed to another nonconforming use of the same "classification" and that "classification" means

the same use or any use that is permissible in the appropriate zoning district. Section 1105.03 therefore allows Oriana House to change the Woman's Home's nonconforming use of the property to the same or another use permitted in an R-3 residential district. A nonprofit institution with sleeping accommodations is a permissible use within an R-3 residential district so long as the Planning Commission approves a special use permit.

{¶ 83} Oriana House's proposed use as a "[p]hilanthropic or nonprofit institution[] with sleeping accommodations" thus is a permissible use in an R-3 zoning district (i.e., the same classification as the Woman's Home's nonconforming use), but only if the Planning Commission grants a special use permit.

{¶ 84} Appellants, however, assert that requiring Oriana House to obtain a special use permit before changing the Woman's Home's nonconforming use conflicts with the language in Section 1105.03 that permits a nonconforming use to be changed to another nonconforming use of the same classification "once as a matter of right." Appellants thus contend that the language "once as a matter of right" means that Oriana House can change the Woman's Home's nonconforming use of the property to another nonconforming use within the same classification without any requirement to obtain a special use permit.

{¶ 85} Section 1113.02(g) plainly states that certain uses in an R-3 zoning district are not granted as a matter of right. Oriana House's proposed change from a residential facility for elderly women to a residential treatment facility, while both in the same classification, is one of the uses that Section 1113.02(g) states is not allowed as a matter of right in an R-3 zoning district. Thus, although Section 1113.02(g)(4) allows the use, it does not allow the use as a matter of right. Instead, it allows the use only if the Planning Commission grants a special use permit.

{¶ 86} Appellants also allege that the zoning ordinances are unclear and do not unambiguously indicate that Section 1113.02(g)(4) requires Oriana House to obtain a special use permit from the Planning Commission before it can lawfully operate a residential treatment facility on the property. Appellants contend that because the ordinances are ambiguous, we must construe them in favor or permitting Oriana House's use. We do not agree. However, even if we agreed that the zoning ordinances are ambiguous, the rules of construction allow us to consider, among other matters, the object that the zoning ordinances seek to attain. R.C. 1.49(A). As we indicated earlier, nonconforming uses are not favored, and the intent of zoning ordinances "is to eliminate such nonconforming uses as rapidly as possible." *Kettering v. Lamar Outdoor Advertising, Inc.*, 38 Ohio App.3d 16, 18, 525 N.E.2d 836 (2d Dist.1987). Thus, "'local governments may prohibit the substantial alteration of a non[-]conforming use in an attempt to eliminate the use or, indeed, regulate the use to the point that it withers and dies.'" *Key Ads, Inc. v. Dayton Bd. of Zoning Appeals*, 2nd Dist. No. 26148, 2014-Ohio-4961, 23 N.E.3d 266, 2014 WL 5794546, ¶ 19, quoting *Gem City Metal Spinning Co.*, 2d Dist. Montgomery No. 22083, 2008-Ohio-181, 2008 WL 185535, ¶ 26.

{¶ 87} In the case sub judice, assuming, arguendo, that the city's zoning ordinances are ambiguous, we construe them to mean that they are intended to eliminate nonconforming uses as quickly as possible and to prohibit substantial changes to an existing nonconforming use. Section 1105.03 allows a nonconforming use to be changed to another nonconforming use within the same classification. The definition of "classification" further indicates that Section 1105.03 allows a nonconforming use to be changed to another (or the same) nonconforming use that is permitted in the zoning district that defines the existing nonconforming use. Section 1105.03 thus requires a

party that wishes to change a nonconforming use to another nonconforming use to consult the use regulations governing the zoning classification of the existing nonconforming use to determine whether the change is permitted.

{¶ 88} As applied in the case at bar, Section 1113.02(g)(4) classifies the Woman's Home's nonconforming use of the property as an R-3 Residential District use that is permitted if the Planning Commission grants a special use permit. Section 1113.02 thus contains the uses to which Oriana House may change the Woman's Home's nonconforming use. We previously noted that Section 1113.02(g)(4) permits Oriana House's proposed nonconforming use so long as Oriana House obtains a special use permit from the Planning Commission.

{¶ 89} To the extent that this conclusion does not appear to flow from the language of the ordinances, we believe that the intent of Section 1105.03 is to ensure that any change to an existing nonconforming use are insignificant and to eliminate the nonconforming use as quickly as possible. To this end, Section 1105.03 permits changes to another nonconforming use of the "same classification."

{¶ 90} Section 1113.02(g)(4), in turn, is the "same classification" and defines Oriana House's proposed change-in-nonconforming-use. Section 1113.02(g)(4) allows the use so long as the Planning Commission approves. The intent of requiring the Planning Commission's approval is to ensure that any changes to the Section 1113.02(g)(4) use are insignificant.

{¶ 91} Consequently, we do not agree with appellants that the trial court incorrectly interpreted Section 1105.03 as it applies to a change in the nonconforming use of property classified as a Section 1113.02(g)(4) use. We do not believe, however, that appellee satisfied its summary judgment burden to demonstrate the absence of a material fact as to whether Oriana

House's proposed nonconforming use of the property is, indeed, a change in the Woman's Home's nonconforming use of the property. Instead, as we explain infra, we believe that genuine issues of material fact remain as to whether Oriana House's proposed nonconforming use of the property is a change in, or a continuation of, the Woman's Home's nonconforming use of the property. As such, appellee did not sustain its burden to show that reasonable minds could only conclude that appellants are violating the zoning ordinances by operating or planning to operate a residential treatment facility on the property without obtaining a special use permit from the Planning Commission.

G

CHANGE OR CONTINUATION IN USE

{¶ 92} We note that appellee has not argued that a mere continuation in a nonconforming use under Section 1105.01 would require Oriana House to obtain a special use permit. Instead, appellee's assertion that Oriana House must obtain a special use permit hinges upon its claim that Section 1105.03 applies. We therefore must determine whether Section 1105.01 or 1105.03 applies, i.e., whether Oriana House's proposed use of the property is a continuation of, or a change in, the Woman's Home's nonconforming use. To resolve this issue, we must ascertain the meaning of the terms "continue," "change," and "use."

{¶ 93} The city's zoning regulations do not define the terms "continue," "change," or "use." Section 101.03 states that "[w]ords and phrases shall be read in context and construed according to the rules of grammar and common usage." Marietta Cod. Ord. 101.03(a). We therefore start by considering the common, everyday meaning of the words. *Marietta v. Bd. of Commrs. of Washington Cty.*, 4th Dist. Washington No. 19CA1, 2019-Ohio-3883, 2019 WL

4701861, ¶ 16, citing *Gamble v. Dobrosky*, 89 Ohio St.3d 257, 259, 730 N.E.2d 969 (2000) (concluding that Merriam-Webster's Collegiate Dictionary contains "the ordinarily accepted meaning" of term in administrative code); Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts, Appendix A, A Note on the Use of Dictionaries, at 419, 423 (2012) (identifying the up-to-date version of Merriam-Webster's Collegiate Dictionary as one of the contemporaneous-usage dictionaries that are "the most useful and authoritative for the English language generally and for law").

{¶ 94} In general, the term "continue" means "to maintain without interruption a condition, course, or action"; "to remain in existence." Merriam-Webster, https : // www . merriam – webster . com / dictionary / continue (accessed Sept. 1, 2020).

{¶ 95} The term "change," when used as a verb, typically means "to make different in some particular"; "to make radically different"; "to replace with another." Merriam-Webster, https : / / www . merriam – webster . com / dictionary / change (accessed Sept. 1, 2020); accord Black's at 231 (defining "change" to mean, in part to "[a]lter; cause to pass from one place to another; exchange; make different in some particular; put one thing in place of another; vacate").

{¶ 96} "The dictionary definition of the verb 'use' is 'to put into action or service * * * EMPLOY.'" *State ex rel. Byington Builders, Ltd. v. Indus. Commission of Ohio*, 156 Ohio St.3d 35, 2018-Ohio-5086, 123 N.E.3d 908, ¶ 24, quoting Webster's Third New International Dictionary 2523 (2002). When the term is used as a noun, it means "the act or practice of employing something" or "the fact or state of being used." Merriam-Webster, https : / / www . merriam – webster . com / dictionary / use (accessed Sept. 1, 2020).

{¶ 97} We additionally observe that the city's zoning ordinances define the various uses

permitted in the defined zoning districts. We again note that the parties agree that Oriana House's proposed nonconforming use and the Woman's Home's nonconforming use fit the same use classification, i.e., nonprofit institutions with sleeping accommodations. The parties do not agree, however, whether Oriana House's use of the property–even though falling in the same use classification as the Woman's Home's use (i.e., Section 1113.02(g)(4)) - is a continuation of the Woman's Home's nonconforming use or is a change in the Woman's Home's nonconforming use.

{¶ 98} Applying the common, everyday meaning of "continue" suggests that Oriana House's use of the property continues the Woman's Home's use of the property if Oriana House maintains the nonconforming use "without interruption" or if the nonconforming use "remain[s] in existence." In contrast, applying the common, everyday meaning of "change" would mean that Oriana House's use of the property changes the Woman's Home's use of the property if Oriana House's use is "different in some particular," is "radically different," or "replace[s] * * * another" use.

{¶ 99} Appellants argue that because both uses fall within the same use classification, i.e., nonprofit institutions with sleeping accommodations, then a change in nonconforming use has not occurred. Appellee, on the other hand, asserts that, even though both uses fall within the same use classification, Oriana House's proposed use as a residential treatment facility is markedly different from a residential facility for elderly women. Appellee claims that inherent differences exists between a residential treatment facility and a residential facility for elderly women. Appellee thus alleges that Oriana House's use of the property would be a change in the Woman's Home's nonconforming use.

{¶ 100} Determining whether a nonconforming use is being continued or changed

ordinarily requires an examination of the facts and circumstances involved in each case.  *See generally* Mack and Pearlman, Ohio Planning and Zoning Law, Section 7:6 (2020 ed.) (reviewing facts of various cases to explain when courts typically conclude that a nonconforming use has been changed to another nonconforming use).  In general, a change in use does not occur when a "proposed use is sufficiently similar to the current use" and when the change has "no greater impact than the use it replaces."  *Id.*; *accord State v. Wagner*, 81 N.J.Super. 206, 210, 195 A.2d 224, 226 (N.J.Co.1963) (citations omitted) (stating that "[i]n order to retain the protection of the law, the use must retain substantially the same character and the same kind of use to which the premises were put at the time of the adoption of the zoning ordinance").  *Compare* 8A McQuillin Mun. Corp, Section 25:282 (footnotes omitted) (stating that "[a] nonconforming use may not be deemed changed if the new use falls within the same division of the use classification.  To illustrate, a motion picture show, a theater, a boat livery * * * may all be within the same use class, and a transfer from one to another within the subdivision does not constitute a prohibited change of a nonconforming use").  Relevant factors that courts may consider include: (1) "whether there is a difference in the quality or character of the use"; (2) "whether the current use is different in kind in its effect upon the surrounding area"; and (3) whether the "premises are adapted only for a particular use."  8A McQuillin Mun. Corp, Section 25:281 (3rd Ed.) (footnotes omitted); *Zachs v. Zoning Board of Appeals*, 218 Conn. 324, 332, 589 A.2d 351 (1991) ("[i]n deciding whether the current activity is within the scope of a nonconforming use consideration should be given to three factors: (1) the extent to which the current use reflects the nature and purpose of the original use; (2) any differences in the character, nature and kind of use involved; and (3) any substantial difference in effect upon the neighborhood resulting from differences in the activities conducted

on the property.").

{¶ 101} For example, in *Akron v. Klein* the court determined that the nonconforming use as a junkyard did not change when a new owner purchased the property and started his own junkyard business. In *Klein*, the city filed a complaint against the property owner for operating a junkyard in an area zoned for residential use. The property owner responded that his operation of the junkyard was a lawful nonconforming use. The evidence showed that the previous owner used the property as a junkyard for several years before the city enacted zoning ordinances to prohibit the activity. Klein later purchased the property and started his own junkyard business on the property. The city argued that the nonconforming use as a junkyard terminated when the previous owner discontinued his junkyard business and sold the property.

{¶ 102} The Ohio Supreme Court recognized that Klein did not acquire any part of the previous owner's junk yard business. The court thus considered "whether it is the use of [the property] in the junk-yard business or only [the property's] use in the [previous owner's] junk-yard business that can be continued as a nonconforming use." *Id.* at 216. To resolve the question, the court looked to the language of the zoning ordinance:

> "'Section A. The Lawful use of any dwelling, building or structure and of any land or premises, as existing and lawful at the time of the passage of this ordinance, may be continued * * *
> Section G. No building or premises where a nonconforming use is voluntarily discontinued for two years or more or superseded by a use permitted in the use district in which it is located, shall again be devoted to any use prohibited in such use district.'"

*Id.* at 216, quoting Akron Zoning Ordinances.

{¶ 103} The court determined that when "a zoning ordinance provides that the lawful use of any land or premises existing at the time of its enactment may be continued as a nonconforming

use, such ordinance continues the right to use land or premises in a residential use district in a business of the same kind as, although it does not represent any continuation or part of, the particular business that was being conducted on such land or premises at the time of enactment of such zoning ordinance." *Id.* at 216.

{¶ 104} In a footnote, the court indicated that its holding is intended to clarify *Akron v. Chapman, supra,* "that it is perhaps only 'the right to continue to use one's property in *a* lawful *business* * * * lawful at the time such business was established' that is the right protected by the Constitution." *Id.* at fn. 5 (emphasis sic). Thus, *Klein* clarified that the right protected under the Constitution is not simply the right of a property owner to continue the identical nonconforming business, but instead, the right is to continue the nonconforming use of the land for a business of "the same kind."

{¶ 105} In the case at bar, the trial court determined that *Klein* does not apply because Oriana House is not seeking to continue the use of the property as a residential facility for elderly women. The court, instead, concluded that Oriana House's residential treatment facility would be a change in the Woman's Home's nonconforming use as a residential facility for elderly women, not a continuation of the Woman's Home's use. The court explained that Oriana House has a "unique identity" as a residential treatment facility and that its proposed use is not the same as the Woman's Home's use as a "multi-family home for elderly women." The court determined that the constitutional guarantee set forth in *Klein* is the right to continue the identical type of business on the premises at the time the nonconforming use was established, and that the same constitutional guarantee does not extend to a succeeding use that differs in any manner from the previous nonconforming use. The court reasoned that *Klein* permits one junkyard to be continued to

another junkyard, but that it does not permit one type of residential facility to be continued to another type of residential facility. More recent cases, however, have not interpreted *Klein* so narrowly.

{¶ 106} For example, in *Deerfield Twp. v. Deerfield Raceway, LLC*, 11th Dist. Portage No. 2007-P-0060, 2008-Ohio-4047, 2008 WL 3270951, the court determined that the addition of stock car racing to a previously-existing raceway did not change the nonconforming use of the property. In *Deerfield*, the property owners primarily used the raceway to race midget cars. Other vehicles, including all-terrain vehicles and motorcycles, also raced at the track. In 2003, new owners added "kid cart" and stock car racing. The township later filed a lawsuit to clarify whether the addition of these types of vehicles destroyed the property's lawful nonconforming use as a raceway. The trial court, however, did not agree that the change in the type of vehicles affected the property's status as a lawful nonconforming use.

{¶ 107} The appellate court affirmed the decision and concluded that "the racing of stock cars does not constitute an expansion or substantial alteration of the use of the property from its prior use as a track for racking midget and/or micro cars." *Id.* at ¶ 31. The court noted that "the basic differences between stock cars and midget and micro midgets are the types of engines and frames used" and "are largely irrelevant to the use of the property as a race track." *Id.* at ¶ 33. The court additionally observed that because "stock cars are 'slower, quieter, safer, and create less dust,' than the midget classes," the "racing of stock cars is not any less in conformity 'with the character and use of the [residential] district * * * than the existing nonconforming use,' i.e. micro midget car racing." *Id.* at ¶ 34, quoting Magistrate's Decision.

{¶ 108} In *Copeland v. Hiram Twp.*, 11th Dist. Portage No. 2017-P-044, 2018-Ohio-5182,

2018 WL 6722949, the court determined that adding ultra-light aircraft and hang gliders to the preexisting nonconforming use of property as an airport did not change the nature of the use of the property. The court noted that the addition of certain types of aircraft did not displace one activity for another and that "the property's use as an airport remained unchanged." *Id.* at ¶ 49.

{¶ 109} In *Hunziker v. Grande*, 8 Ohio App.3d 87, 456 N.E.2d 516 (8th Dist. 1982), the court determined that "[a]n increase in the volume of business alone does not constitute an unlawful extension of a nonconforming use where the nature of the land is virtually unchanged." *Id.* at 89. In that case, the property had been used as a wholesale and retail nursery before the city enacted zoning regulations to place the property in a one-family residential district. The city filed a complaint for injunctive relief to prohibit the owners from operating a nursery due to an "increase in the proportion of retail sales as opposed to wholesale sales." *Id.* The trial court denied the request for an injunction, the appellate court affirmed the decision. The court noted that the property owners did not increase the area of land used as a nursery and had not made any substantial changes to the nature of the use of the property. The court recognized that the city "may prohibit the expansion or substantial alteration or repair of existing building in attempting to eradicate the nonconforming use." *Id.* at 89. The court explained, however, that the city "may not seek to prohibit a mere increase in the volume of business or in the proportions of that business." *Id.* at 89. The court thus affirmed the trial court's decision that denied the city's request for an injunction.

{¶ 110} In *Stewart v. Pedigo*, 2 Ohio App.2d 53, 206 N.E.2d 429 (9th Dist. 1965), the court determined that changing the use of the property "from the display of motor-driven garden and lawn tools to that of motor-driven vehicles for transportation" did not violate the township's zoning

ordinance.  *Id.* at 56.  In *Stewart*, the property had been used to display garden tractors and lawn mowers, but later was used to display motor vehicles.  The township alleged the use violated the township's nonconforming use ordinance.  The ordinance stated:

> Whenever the use of any dwelling, building or structure and any land or premises becomes nonconforming through an amendment of this resolution, such use may continue and if no structural alterations are made, it may be changed to another nonconforming use of the same or a more restricted classification.

{¶ 111} The court found that the display of motor vehicles did not substantially change the nature of the property's use when it did not have any negative effects on traffic and was not "offensive in any way by reason of noise, smoke, or other matter."  *Id.* at 56.  The court thus concluded that switching the type of inventory displayed on the property from motorized lawn equipment to motor vehicles did not constitute a substantial change in the property's nonconforming use.

{¶ 112} In *Bowling Green v. Violet*, 6th Dist. Wood No. 85-CR-B-311, 1986 WL 2682 (Feb. 28, 1986), the court held that the addition of two tenants to a building that had housed four tenants did not constitute a change in the nonconforming use of the property as housing for unrelated persons.  In *Violet*, before the city enacted zoning ordinances to prohibit the property from housing unrelated persons, the property was used to house four unrelated individuals.  After the city enacted the zoning ordinances, six unrelated individuals lived on the property.  The parties agreed that the occupancy by four unrelated persons was a legal nonconforming use, but disputed whether the addition of two unrelated individuals constituted a change in the nonconforming use. The city asserted that the addition of the two unrelated individuals violated the zoning ordinance that prohibited the change or expansion of a nonconforming use.

{¶ 113} The trial court concluded that the city's ordinance did not prohibit an increase in

the volume or magnitude of the building's nonconforming use. Instead, the ordinance regulated changes to the nonconforming use. The court thus determined that an increase in the number of unrelated individuals did not constitute a change in the nonconforming use. The court observed:

> Legal writers have uniformly recognized the distinction between a prohibited change or extension of a nonconforming use and a permissible expansion or intensification of that use.
> "An increase in the volume of a trade or business conducted as a nonconforming use or other intensification of the use is generally held to be permissible so long as the basic nature and character of the use is unchanged from that which existed at the time the use or structure became nonconforming." 4 Rathkopf, The Law of Zoning and Planning (4 Ed. 1985), 51-86, Section 51.07.

*Violet* at *4.

{¶ 114} The appellate court affirmed and adopted the trial court's decision as its own. In reaching its decision, the *Violet* court relied upon a New Jersey case, *New Jersey v. Wagner*, 195 A.2d 224 (1963), in which the court determined that the property owner did not substantially change the nonconforming use of the property as a rental unit by increasing the number of tenants. The court also held that the property owner's increase in the number of tenants did not require that the property owner comply with the township's current zoning regulations that required a special use permit for "boarding houses."

{¶ 115} The property in *Wagner* consisted of one house divided into two apartments. The original property owner lived in one apartment and rented the other. The township later enacted zoning ordinances that placed the property in a single-family residential district.

{¶ 116} At some point, the property sold and the new owner, Wagner, rented one apartment to twelve female students who attended a nearby college. The township charged that Wagner violated a zoning ordinance that prohibited the property from being used as a boarding house without a special permit. The parties agreed that, before Wagner purchased the property, the use

of the premises to house unrelated person was a nonconforming use and that the zoning ordinances did not affect the nonconforming use "so long as the use was not changed or extended beyond the limits prescribed by the ordinance itself." *Id.* at 209.

{¶ 117} The ordinance in *Wagner* stated:

> (j) Non-Conforming Uses.
> 1. Continuation Thereof:
> All buildings, structures and the uses not conforming to the regulations of the district in which they are located, at the time of this enactment, shall be known and regarded as "non-conforming".
> A non-conforming building or use may be continued and may be changed to another non-conforming use of the same or a more restricted classification, but no additions or extensions of such building or use shall be made, exceeding: (1) 25 percent of the occupied floor area; or (2) 25 percent of the cubical contents of the building or buildings as existing at the time of this enactment; or (3) 25 percent of the service capacity of a use conducted all or partially in the open; and provided further, that subsequent to such extension or addition to a non-conforming building or use, there shall be no further additions or extensions except in accordance with the regulations of the district in which such building or use is located.

*Id.* at 209–10.

{¶ 118} The court concluded that Wagner's "leasing of one-half of the premises to 12 college students [did not] represent[] an improper enlargement or extension of the permissible nonconforming use." *Id.* at 211. The court thus concluded that the zoning ordinance could not "modify, restrict or qualify [Wagner's] current use of the premises." *Id.*

{¶ 119} The township nevertheless argued that, because the zoning ordinances defined Wagner's current use of the property as a boarding house, Wagner was required to obtain a special permit. The court, however, disagreed and explained:

> The deficiency in the State's argument is that it overlooks the fact that the zoning ordinance, or any definition contained therein, has no application to, nor control of, a nonconforming use. It makes no difference that defendant can be said to operate a rooming or a boarding house within the definition of the ordinance, if such use by defendant does not represent a substantial change from the

nonconforming use of the premises permitted to defendant by law.

Clearly, defendant could, with complete propriety, have leased the space in question to 'more than three persons.' The property had, in fact, been devoted to such use, and to occupancy by more than three persons, both before and after the passage of the zoning ordinance.

The use here attacked by the State is not substantially different than the pre-existing, nonconforming use of the property. Absent an affirmative showing by the State that the occupancy of the premises by the young ladies could be distinguished from the occupancy of the various previous tenants, in that the young ladies' occupancy created special or different problems in this residential community, and which problems could be said to be violative of and inconsistent with the design and intention of the zoning ordinance, the only valid distinction between the permitted use and the use complained of is in the number of tenants occupying the premises.

A mere increase in number of tenants, even though a considerable increase, not requiring any alteration or physical enlargement or change of the premises to accommodate a larger number of tenants, is only an increase in the 'intensity' or 'degree' of use and cannot be said to represent a substantial, and thereby unlawful, enlargement or extension of defendant's nonconforming use.

*Id.* at 211–12.

{¶ 120} In *Triangle Fraternity v. Norman ex rel. Norman Bd. Of Adjustment*, 63 P.3d 1 (Okla. 2002), the court determined that "a fraternity's proposed use of a property as a fraternity house" is "substantially the same" use "as the property's former use as a retired women's boarding house." *Id.* at 2. The court thus concluded that the fraternity was entitled to "an extension of the existing nonconforming use." *Id.*

{¶ 121} In reaching its decision, the court compared the evidence presented at trial regarding the use of the property as a retirement home for women and the proposed use as a fraternity house. The court noted that when the property was used as a retirement home for women, twenty to twenty-two individuals lived on the property, "[m]eals were prepared for the individuals, social and recreational activities were organized, and some of the residents had automobiles." *Id.* at 7. The fraternity's proposed use would involve "meetings, activities, parties

and other occasional functions." *Id.* Additionally, the fraternity expected twenty-two or twenty-three residents to live on the premises. The fraternity also intended to allow alcohol on the premises.

{¶ 122} The court concluded that "the fraternity's proposed use of the property is substantially the same as that in existence since it was built in 1930. The character of its use as a residential building for persons who are not members of the same family where rooms are rented on a monthly or longer basis, meals are provided, and social activities occur has not changed in the seventy years since the house was built. The character of the neighborhood would not significantly change by the fraternity's occupancy of the home. The evidence presented at trial reveals that the only real difference in [the two uses] is the age of the occupants coupled with an increase in the volume, intensity, and frequency of social gatherings. However, a mere increase in volume, intensity, or frequency of a nonconforming use is generally recognized as insufficient" to demonstrate a change in use. *Id.* at 7. The court thus concluded that the fraternity was "entitled to an extension of the existing nonconforming use."

{¶ 123} The foregoing cases show that courts have generally been unwilling to find that a change in a nonconforming use has occurred unless the succeeding nonconforming use differs in some significant respect from the preceding nonconforming use. Courts have indicated that a change in nonconforming use does not occur unless the succeeding nonconforming use changes the fundamental nature and character of the activity conducted on the property, or has a significant effect on the surrounding community.

{¶ 124} For example, in *Herres v. Board of Trustees Harrison Twp.*, 2nd Dist. No. 23668, 2010-Ohio-3909, 2010 WL 3292047, the court concluded that a new owner substantially changed

the previous lawful nonconforming use as a commercial greenhouse when the new owner started to use the property as outdoor storage for his business. After the previous owner started to use the property as a commercial greenhouse, the township enacted a zoning ordinance to place the property in a residential district. The use of the property as a commercial greenhouse thus became a legal nonconforming use.

{¶ 125} Herres later purchased the property and used it to store items used in his landscaping business such as: (1) a sixteen-foot box truck, (2) a twenty-six foot flat bed truck, (3) a pick-up truck, (4) two dump trucks, (5) a front-end loader with attachments, (6) mowing equipment, (7) trailers, (8) construction materials, and (9) skids of bagged fertilizer and other landscaping materials like retaining wall blocks, trees, and burlap. The township claimed that Herres's use violated its zoning ordinances and exceeded the scope of the property's nonconforming use as a horticultural business. The township submitted evidence that the previous owner did not store any materials outside of the greenhouses and did not park any business vehicles on the property. Herres argued that his use was substantially the same as the previous owner and claimed that he stored plants in one of the greenhouses before planting them for customers.

{¶ 126} The trial court determined that Herres "changed, expanded, and increased the nature and intensity of the nonconforming horticultural use" of the property and, thus, discontinued the property's previous lawful nonconforming use. *Id.* at ¶ 12. The trial court referred to photographs that showed construction-related equipment on the property – vehicles, bobcats, campers, lumber, and plows. The appellate court affirmed and explained that Herres's "storage of items such as a front-end loader and its attachments, construction trailers, box trucks with

commercial logos, dump trucks, unlicensed vehicles, lumber, decking, siding, retaining wall block, pavers, pond pumps, skids of landscaping supplies, and garbage is not a continuation of a legal non-conforming use." *Id.* at ¶ 22. The court concluded that Herres's "outdoor storage in running a construction and landscaping business are such substantial alterations to the legal nonconforming use established by [the previous owner] that [Herres] has voluntarily discontinued the legal nonconforming use." *Id.* at ¶ 23.

{¶ 127} In *Ledford v. Board of Zoning Appeals*, 171 Ohio App.3d 24, 2007-Ohio-1673, 869 N.E.2d 1113 (2nd Dist.), the court determined that adding an automobile repair garage destroyed the property's nonconforming use status as a towing and automobile parts retail business. In *Ledford*, the property had been used as a towing and automobile parts retail business since the 1960s, before the city enacted zoning regulations that would have prohibited the business. The use as a towing and automobile parts retail business thus was a lawful nonconforming use. The property owners later sought to operate an automobile repair garage on the property. The zoning ordinance permitted automobile repair garages as conditional uses within the district where the property was located. The property owners asserted that adding an automobile repair garage was within the scope of the lawful nonconforming use as a towing business and, thus, they should not be required to obtain a conditional use permit.

{¶ 128} The appellate court, however, did not agree. The court noted that the property owners did not present any evidence that the preexisting towing business included automobile repair. The court determined that "attaching an automobile repair garage as a permitted use of the * * * property to [the] valid towing and automobile parts retail business would constitute a substantial alteration to the preexisting nonconforming use." *Id.* at ¶ 38. The court thus

concluded that the property's lawful nonconforming use as a towing and automobile parts retail business would terminate if the property owners chose to pursue obtaining a conditional use permit to operate an automobile repair garage.

{¶ 129} In *QRP Dayton Properties, LLC v. Jefferson Twp. Board of Zoning Appeals*, 2nd Dist. Montgomery No. 25984, 2014-Ohio-2209, 2014 WL 2169849, the court determined that engaging in a scrap metal business on property used as an automobile salvage business violated the township's zoning code. In that case, the property's use as an auto salvage business was a lawful nonconforming use. When a new owner purchased the property, the owner expanded the business to include scrap metal sales. This scrap metal business "consisted of 'walk-ups,' or 'people * * * dragging there [sic] trashcans or their shopping carts * * * and all the * * * stuff that just doesn't look great[,]' including 'aluminum, wrought iron, beer cans, tires, circuit boards, computers, air conditioners and refrigerators free of hazardous substances, copper, speakers, and wires.'" *Id.* at *1. The township subsequently issued a zoning violation notice to the property owner for "operating [the] business out of the scope of allowable use." *Id.*

{¶ 130} The property owner claimed that his use was a continuation of the previous lawful nonconforming use as an automobile junkyard. He alleged that scrap metal "is merely another form of junk" and that his use as a scrap metal business did not change the property's nature and character *Id.* Area residents testified, however, that the scrap metal business increased thefts. They stated that "people were stealing scrap metal and other property from occupied houses and selling the stolen materials to" the appellant's business. *Id.* at *2.

{¶ 131} The board of zoning appeals determined that the property owner violated the zoning code by "extend[ing], enlarg[ing], and/or increas[ing the] intensity of the nonconforming

use of the property." *Id.* The trial court upheld the board's decision and determined that the property owner's "use of the property to purchase scrap metal does not bear a reasonable similarity to its [original] nonconforming use in auto part sales." *Id.* at *2.

{¶ 132} The property owner appealed and asserted that using the property "as a scrap metal business did not change the nature and character of the property's prior nonconforming use as an automobile junkyard that sells salvaged auto parts." *Id.* On appeal, the court concluded that the zoning ordinances did not permit the property owner to use the property as a scrap metal business. The court observed that the "original nonconforming use of the property was only for the sale of parts of junked automobiles" and the zoning code did not allow the use of the property to be extended to include scrap metal. *Id.* at *5. The court further noted that evidence existed that using the property as a scrap metal business negatively impacted the surrounding community and increased scrap metal theft and scrap metal materials.

{¶ 133} In *Fellowship House Ministries, Inc. v. Zoning Board of Appeals*, Superior Court of Connecticut No. CV 960538805, 1997 WL 728917 (Nov. 13, 1997), the property had been used as a rooming house before zoning ordinances were enacted to prohibit the use as a rooming house. Thus, the property's use as a rooming house was a lawful nonconforming use. The property later sold to Fellowship House Ministries (FHM) who intended to use the property to provide transitional housing services to the Alternative Incarceration Center. The city later sought to prevent the property from being used to provide transitional housing services and the zoning board of appeals determined that FHM's use of the property constituted a change in use, i.e., a "[c]hange of use from a non-conforming rooming house to an alternative incarceration center." *Id.* at *1.

{¶ 134} FHM appealed the board's decision and asserted that the property was still used as

a rooming house and the nonconforming use had not changed.    FHM argued that the fundamental character of the property remained a rooming house.   FHM claimed that, like its predecessor in title, it provided individuals with a place to live.

{¶ 135} The zoning regulations defined a "rooming house" as:  "A building in which rooms are rented for compensation to more than one (1) and less than sixteen (16) persons other than members of the family of the proprietor.   The serving of meals or provisions for cooking is prohibited."   *Id.* at *3, quoting Zoning Regulations, City of Groton.   The court determined that, even though the property continued to house individuals, "[t]he central component is the control and supervision of * * * specific individuals."   *Id.* at *9.   The court found that providing housing to the individuals was simply an "adjunct" need and that "[h]ousing [was] not the primary ingredient."   *Id.* at *9.   Instead, "the structure, supervision, and the like" are FHM's "raisons d'etre."   *Id.*   The court explained that "housing is only an incidental" to FHM's stated mission of providing "a high measure of client supervision and accountability" and "a maximum level of supervision."   *Id.* at *10.   Because the court concluded that the use of the property now resembles a corrections facility, and not of a rooming house, the court upheld the trial court's decision that FHM changed the nonconforming use and that it was no longer used as a rooming house.

{¶ 136} A review of cases reveals that the inquiry into whether a proposed nonconforming use is a continuation or a change in a nonconforming use is highly fact specific.  A few rules emerge, however.   First, courts are more likely to conclude that a nonconforming use has been changed to a different nonconforming use when the addition of items or activities fundamentally changes the nature of the use.   Moreover, courts are more likely to conclude that a change in nonconforming use occurred if the succeeding use has a greater impact on the surrounding

WASHINGTON, 19CA23

community than the preceding nonconforming use.

{¶ 137} In the case at bar, we do not believe that appellee presented evidence in support of its summary judgment motion that would allow reasonable minds to conclude only that Oriana House's proposed use of the property as a residential treatment facility constitutes a change in the Woman's Home's nonconforming use as a residential facility for elderly women.   In fact, appellee did not present any evidence at all to support its summary judgment motion.   Instead, appellee relied upon its bare allegation that a residential treatment facility differs from a residential facility for elderly women.[3]   Thus, appellee did not present any evidence to document the types of activities that the Woman's Home's had conducted on the premises and whether Oriana House's proposed activities would be fundamentally different from the Woman's Home's activities.   Furthermore, appellee did not present any evidence to show that Oriana House's proposed use of

---

[3] We note that R.C. 5166.01 defines a "[r]esidential treatment facility" as

a residential facility licensed by the department of mental health and addiction services under section 5119.34 of the Revised Code, or an institution certified by the department of job and family services under section 5103.03 of the Revised Code, that serves children and either has more than sixteen beds or is part of a campus of multiple facilities or institutions that, combined, have a total of more than sixteen beds.

Additionally, R.C. 5119.34(B)(1) defines a "residential facility" as follows:

(B)(1) A "residential facility" is a publicly or privately operated home or facility that falls into one of the following categories:
(a) Class one facilities provide accommodations, supervision, personal care services, and mental health services for one or more unrelated adults with mental illness or one or more unrelated children or adolescents with severe emotional disturbances;
(b) Class two facilities provide accommodations, supervision, and personal care services to any of the following:
(i) One or two unrelated persons with mental illness;
(ii) One or two unrelated adults who are receiving payments under the residential state supplement program;
(iii) Three to sixteen unrelated adults.
(c) Class three facilities provide room and board for five or more unrelated adults with mental illness.

the premises as a residential treatment facility would pose traffic problems, congestion, or otherwise have a greater impact on the surrounding community than the Woman's Home's use of the property as a residential facility for elderly women. Appellee's bare allegation that a residential treatment facility is different from a residential facility for elderly women is not sufficient to show the absence of a material fact regarding whether Oriana House's proposed use of the property would constitute a change in the Woman's Home's nonconforming use of the property.

{¶ 138} Therefore, because appellee did not establish the absence of a genuine issue of material fact as to whether Oriana House's proposed use of the property would be a change in use, appellee has not shown that Section 1105.03 applies to Oriana House's proposed use. As we noted earlier, Section 1105.03 applies when one nonconforming use is changed to another nonconforming use of the same classification. Here, appellee did not establish the absence of a genuine issue of material fact regarding whether Oriana House is seeking to change one nonconforming use to another of the same classification. Appellee thus did not establish that Section 1105.03 applies as a matter of law.

{¶ 139} Our conclusion that appellee failed to satisfy its summary judgment burden does not, however, mean that appellants are entitled to summary judgment in their favor regarding appellee's request for an injunction. We note that appellants also moved for summary judgment and, thus, also bore the burden to show that no genuine issues of material fact remain that they are not violating the city's zoning ordinances by failing to obtain a special use permit from the Planning Commission. As we noted earlier, appellants' first claim that Oriana House simply is seeking to continue the Woman's Home's nonconforming use of the property as a nonprofit

institution with sleeping accommodations.   Appellants contend that because both Oriana House's proposed use and the Woman's Home's use are defined as nonprofit institutions with sleeping accommodations, the uses are the same kind of uses.   Appellants thus assert that Oriana House has a constitutional right to continue the Woman's Home's nonconforming use of the property and need not obtain a special use permit.

{¶ 140} For appellants to be entitled to summary judgment, therefore, appellants must establish that no genuine issues of material fact remain as to whether Oriana House's use of the property as a residential treatment facility is a continuation of the Woman's Home's nonconforming use as a residential facility for elderly women.   Appellants have established that both uses fall within the same use classification as nonprofit institutions with sleeping accommodations.   However, beyond the bare fact of the use classification, appellants did not produce any evidence to show that the Oriana House activities will be of the same or similar nature and character as the Woman's Home activities conducted on the premises.   Although the fact that both uses may fall within the same use classification could be some evidence that Oriana House's use is a continuation of the Woman's Home's use, case law indicates that the underlying nature of the activities also must be thoroughly examined in order to determine whether a change in use occurred.   Without evidence to show that Oriana House's proposed use of the property would not constitute a substantial change from the Woman's Home's use of the property, one cannot conclude that appellants satisfied their burden to show the absence of a material fact as to whether Oriana House's proposed use constitutes a continuation of the Woman's Home's nonconforming use.

{¶ 141} In sum, in the case sub judice we believe that neither party presented evidence to

establish the absence of a genuine issue of material fact regarding whether appellants' intended use violates the applicable zoning ordinances. Appellee did not establish the absence of a genuine issue of material fact as to whether Oriana House's use is a change in the Woman's Home's nonconforming use. As such, appellee did not establish that Section 1105.03 and related ordinances require Oriana House to obtain a special use permit from the Planning Commission.

{¶ 142} Moreover, appellants did not establish the absence of a genuine issue of material fact as to whether Oriana House's use is a continuation of the Woman's Home's nonconforming use. Appellants thus did not establish, as a matter of law, that Section 1105.01 applies and that Oriana House need only obtain a use and occupancy permit before it can lawfully operate a residential treatment facility.

{¶ 143} Accordingly, based upon the foregoing reasons: (1) we sustain appellants' first and third assignments of error, (2) we overrule appellants' second assignment of error, and (3) we reverse the trial court's summary judgment in appellee's favor and its judgment that granted appellee an injunction to prohibit appellants from operating a residential treatment facility on the property unless appellants obtain a special use permit from the Planning Commission. We hereby remand this matter to the trial court for further proceedings consistent with this opinion.

JUDGMENT REVERSED AND CAUSE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

## JUDGMENT ENTRY

It is ordered that the judgment be reversed and cause remanded for further proceedings consistent with this opinion.   Appellee and appellants shall equally share the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Washington County Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Hess, J.: Concur in Judgment & Opinion

For the Court

BY:_____
Peter B. Abele, Judge

WASHINGTON, 19CA23

## NOTICE TO COUNSEL

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.